UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CFO RICK INC,<br><br>                    Plaintiff,<br><br>         v.<br><br>MICHAEL YOUNG,<br><br>                    Defendant. | Case No.  25-cv-09896-EMC<br><br>**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DEFENDANT'S MOTION TO DISMISS**<br><br>Docket Nos. 12, 22 |

The above-referenced case is a declaratory judgment action.  The putative plaintiff is CFO Rick, Inc., and the putative defendant is Michael Young.

- CFO Rick is a company that provides accounting and financial services to other companies.  Its CEO is Rick Belgarde.  One of the companies that CFO Rick has provided services to is Millwright Holdings, LLC.

- Mr. Young is the majority owner and managing member of Millwright.  It appears that, as of 2020, there were only two members of Millwright: Mr. Young and Mr. Belgarde (who, as noted above, is also the CEO of CFO Rick).  Mr. Young is the majority owner of Millwright, and Mr. Belgarde is the minority owner.  For at least a period of time, Mr. Belgarde also served as the CFO of Millwright.

In November 2025, Mr. Young initiated an arbitration against both Mr. Belgarde and CFO Rick, claiming that they had engaged in misconduct in conjunction with work done for Millwright. The arbitration demand was filed with AAA.  CFO Rick filed this lawsuit shortly thereafter

seeking a declaratory judgment that it is not subject to arbitration.[1]  Now pending before the Court is (1) Mr. Young's motion to compel CFO Rick's case to arbitration and (2) Mr. Young's motion to dismiss CFO Rick's case.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** both motions.

## I.      FACTUAL & PROCEDURAL BACKGROUND

The following narrative is based on CFO Rick's complaint and the declarations filed by the parties in conjunction with the pending motion to compel arbitration.  There are no disputes of fact unless so noted.

A.      Millwright

Millwright is an LLC formed in Delaware in or about 2017.  As of 2020, Millwright had only two members: Mr. Young and Mr. Belgarde (as reflected by an LLC Agreement signed in August 2020).  *See* Compl., Ex. A (LLC Agreement).

Although not entirely clear, there seems to be no dispute that, at some point in time, Mr. Belgarde became Millwright's CFO.  There also seems to be no dispute that CFO Rick provided accounting and financial services for Millwright, both before and after Mr. Belgarde became Millwright's CFO.

The parties do dispute, however, whether CFO Rick essentially acted as the CFO for Millwright, either before or after Mr. Belgarde became Millwright's CFO.  Mr. Young takes the position that CFO Rick essentially carried out CFO duties before and after.  CFO Rick disagrees. *See, e.g.*, Belgarde Decl. ¶ 24(r) ("CFO Rick DENIES Young's allegations that the financial oversight of the Company was entrusted to Belgarde in his capacity as CFO, and that underlying duties associated with that role were delegated and then carried out by CFO Rick."); Belgarde Decl. ¶ 24(y) ("CFO Rick DENIES Young's allegations that there was no instance in which the roles of Belgarde and CFO Rick (as to Millwright) diverged or the duties were separately exercised."); Belgarde Decl. ¶ 24(aa) ("CFO Rick DENIES Young's allegations that CFO Rick's provision of services to Millwright and Belgarde's performance of the Company's CFO role are

---

[1] In a separate suit (No. C-25-10863), Mr. Belgarde filed his own action against Mr. Young, seeking a declaration that the claims asserted against him in arbitration are not arbitrable.

United States District Court
Northern District of California

indistinguishable.").

B.      LLC Agreement for Millwright

As noted above, Millwright has an LLC Agreement (also referred to as the Operating Agreement).  *See* Compl., Ex. A (LLC Agreement).

The LLC Agreement states that the parties to the contract are: (1) Millwright; (2) each individual executing the Agreement as a member; (3) other individuals who from time to time become members by joining the Agreement; and (4) "other persons who are otherwise bound or become bound by [the] Agreement as provided herein."  Compl., Ex. A (LLC Agreement at 1).

Both Mr. Young and Mr. Belgarde executed the LLC Agreement as members of the LLC. The signature page for the contract bears their signatures and reflects that each signed the LLC Agreement as a "member" of the LLC specifically.  *See* Compl., Ex. A (LLC Agreement) (at page 35, showing signatures for Mr. Young and Mr. Belgarde under the caption "THE COMMON MEMBERS").

The LLC Agreement notes that Mr. Young is the majority owner of Millwright, and Mr. Belgarde the minority owner.  *See* Compl., Ex. A (LLC Agreement, Scheule A).  It also states that Mr. Young is the manager of Millwright.  *See* Compl., Ex. A (LLC Agreement § 7.1).

The LLC Agreement further provides that "[t]he Manager may appoint and remove from time to time such officers of the Company as the Manager determines advisable, each of whom shall exercise such powers and perform such duties as shall be determined by the Manager from time to time."  Compl., Ex. A (LLC Agreement § 7.8).  The agreement does not expressly appoint Mr. Belgarde as Millwright's CFO but seems to reflect that Mr. Belgarde either already was or would become the CFO for Millwright.  In § 6.7(c), the agreement states:

> Each Member agrees that, while such Member is a Member of the Company, such Member will not, and shall cause his Affiliates not to, directly or indirectly, without the express written consent of the Company:
>
> (1)      own or have an interest in or act as an officer, director, partner, principal, shareholder, sole proprietor, employee, agent, representative, consultant, member, manager or independent contractor of any proprietorship, partnership, firm, trust, corporation, limited liability company, or other Organization that operates a business that competes with the

United States District Court
Northern District of California

> Company's Business in the geographic area in which the Company does business; **provided, that with respect to Belgarde, his acting as Chief Financial Officer** and as a provider of accounting services for companies conducting the Company's Business that are not direct competitors of the Company shall not be a violation of this Section 6.7.

Compl., Ex. A (LLC Agreement § 6.7(c) (emphasis added). CFO Rick maintains that Mr. Belgarde was not "assigned the CFO title or duties by virtue of signing the [LLC] Agreement." Belgarde Decl. ¶ 25(i). Other than referring to Mr. Belgarde acting as the CFO, the LLC Agreement says nothing else about the CFO position.

One of the substantive terms of the LLC Agreement is that

> [e]ach Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members, the Manager and their Affiliates. In any such event, those dealings and undertakings shall be at arm's length and on commercially reasonable terms, and no Manager or officer shall use the Manager's or officer's office to obtain favorable treatment for or on behalf of the Manager or officer, Affiliates or others which would not otherwise be received in an arm's length transaction.

Compl., Ex. A (LLC Agreement § 6.7(b)).

Another substantive term in the LLC Agreement provides:

> The Manager's and officers' duty of care in the discharge of his or her duties to the Company is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law which results or shall have resulted in material loss or injury to the Property or operations of the Company.

Compl., Ex. A (LLC Agreement § 8.1).

Finally, the LLC Agreement contains an arbitration clause. It states as follows.

> 12.14 **Dispute Resolution**. To the extent feasible, the parties desire to resolve any controversies or claims arising out of or relating to this Agreement through discussions and negotiations between each other. All parties agree to attempt to resolve any disputes, controversies or claims arising out of or relating to this Agreement by face-to-face negotiation with the other party. Any dispute arising under the terms of this Agreement that cannot be resolved by the Members shall be resolved by mediation or binding arbitration in accordance with the rules of the American Arbitration Association ("**AAA**") applying the substantive law of the state of Delaware, without regard to any conflict of law provisions. The arbitration shall be held at the AAA offices closest to San Francisco, California. The arbitration shall be governed by the rules of civil procedure for actions filed in California superior courts as set forth in the California Code of Civil Procedure, and the parties shall have all

4

rights and powers afforded to a civil litigant in the Superior Court, including the ability to conduct full discovery.

Compl., Ex. A (LLC Agreement § 12.14).

C.    Arbitration Demand

In November 2025, Mr. Young initiated an arbitration against both Mr. Belgarde and CFO Rick. Mr. Young initiated the arbitration based on the arbitration provision in the Millwright LLC Agreement. *See* Compl. ¶ 29.

A copy of the arbitration demand can be found at Exhibit A to the Kelly Declaration. The demand is, at times, hard to follow. The main allegations in the demand seem to be as follows:

- Mr. Young started Millwright;

- CFO Rick began doing work for Millwright (it was already doing work for at least one other company affiliated with Mr. Young);

- Mr. Belgarde wanted to become a minority member and the CFO of Millwright, and Mr. Young agreed;

- Mr. Belgarde became a minority member as well as the fractional (*i.e.*, part-time) CFO for Millwright;

- while Mr. Belgarde was CFO for Millwright, he had CFO Rick do all CFO-related work for Millwright;

- CFO Rick was paid excessive amounts and/or unauthorized amounts; and

- Mr. Belgarde engaged in other misconduct vis-à-vis Millwright such as misappropriating loan proceeds and using them to fund the obligation he owed to Millwright as a member.

*See also* Mot. at 7 (asserting that "CFO Rick was delegated and actively performing all the duties and obligations of Belgarde under the [LLC] Agreement"; that "CFO Rick performed 100% of the CFO obligations[] and Belgarde performed none independently"; that "concerns emerged about the accuracy and reliability of financial reporting" as Millwright "began to observe delays in the preparation of statements, inconsistencies between reported figures and underlying records, and gaps in the supporting documentation needed for tax or investor-related purposes"; that "CFO Rick had begun unilaterally claiming and receiving significant increases in compensation above

5

what had been agreed to by [Mr. Young]"; etc.).

In his arbitration filing, Mr. Young asks for damages of more than $1.3 million. *See* Compl. ¶ 28; Kelly Decl., Ex. A (Arb. Demand ¶ 96). According to CFO Rick, Mr. Young initiated the arbitration simply to avoid paying CFO Rick approximately $460,000 owed for accounting and tax services provided. *See* Compl. ¶ 31.

CFO Rick has filed the pending lawsuit to, in essence, prevent the arbitration from proceeding against it. Specifically, CFO Rick seeks a declaratory judgment that it cannot be compelled to arbitrate. As noted above, Mr. Belgarde is not a plaintiff in this suit; only CFO Rick is.

## II.     DISCUSSION

As noted above, pending before the Court are (1) Mr. Young's motion to compel CFO Rick to arbitration and (2) Mr. Young's motion to dismiss CFO Rick's suit which essentially asks for a declaration that he is not obligated to arbitrate. Essentially, the two motions overlap. The Court addresses the motion to compel first, particularly because that motion involves the submission of evidence.

### A.     Motion to Compel Arbitration[2]

Mr. Young asserts that the motion to compel is governed by the Federal Arbitration Act ("FAA"), and CFO Rick does not argue otherwise. CFO Rick, however, maintains that it never had an agreement to arbitrate with Mr. Young in the first place and that it cannot otherwise be compelled to arbitrate.[3]

---

[2] Mr. Young's motion is titled one to compel arbitration. Technically, he is not moving to compel this lawsuit (in which CFO Rick is asking for a declaratory judgment that it is not obligated to arbitrate) to arbitration. Rather, Mr. Young is essentially addressing the merits of CFO Rick's contention that it is not obligated to arbitrate. CFO Rick, however, has not opposed Mr. Young's motion on the ground that it is procedurally improper. Rather, it has engaged in a discussion of the merits. The Court therefore proceeds with an evaluation of whether there was an agreement to arbitrate between the parties.

[3] There is no dispute that the issue of contract formation is one for the Court to decide, not the arbitrator. Mr. Young, however, asserts that, if the Court finds there was an agreement to arbitrate, then all other gateway issues of arbitrability are for the arbitrator to decide because (1) the AAA rules govern the arbitration and (2) the AAA rules clearly and unmistakably delegate gateway issues of arbitrability to the arbitrator.

In *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), the Supreme Court made clear that "state contract law regarding the scope of agreements (including the question of who is bound by them)" applies even in cases governed by the FAA. *Id.* at 630. Therefore, the Court must consider state law in assessing whether CFO Rick can be compelled to arbitration.

In his papers, Mr. Young contends that Delaware law governs, pointing out that the Millwright LLC Agreement, which contains the arbitration clause, states that it "will be governed by and construed in accordance with the laws of Delaware applicable to agreements executed and to be wholly performed within Delaware." Compl., Ex. A (LLC Agreement § 12.13). In response, CFO Rick asserts that California law governs because it is challenging whether it is bound by that contract in the first instance. *See* Opp'n at 14 (arguing that the choice-of-law provision in the agreement cannot govern when there is a dispute about whether there was an agreement). As a practical matter, it does not matter which state's laws govern. Neither Mr. Young nor CFO Rick has pointed to a material difference between each state's laws related to contract formation and/or when a nonsignatory to a contract can be bound.[4]

Although the Court's focus will be on substantive state law given the issues raised in the parties' briefs, the FAA is still significant as a procedural matter. Title 9 U.S.C. § 4 provides in relevant part that there can be a trial on the issue of contract formation:

> If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon

---

[4] As the Ninth Circuit has stated in *Knapke v. PeopleConnect*, 38 F.4th 824 (9th Cir. 2022), a choice-of-law decision should start with applying the choice-of-law rules of the forum state – which here is California. See id. at 832 (noting that "[d]istrict courts sitting in diversity apply the choice-of-law rules of the forum state"); *see also* Compl. ¶ 6 (asserting diversity jurisdiction because CFO Rick is a citizen of California and Mr. Young is a citizen of Connecticut). California applies a three-step governmental interest test. *See Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1068 (9th Cir. 2021). At step one, a court must determine whether there is even a conflict in the potentially applicable state laws. *See id.* (stating that a court first "'determines whether the relevant law of the potentially affected jurisdictions with regard to the particular issue is the same or different'"). As noted above, neither party seems to claim a conflict in the laws of Delaware and California.

> such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

9 U.S.C. § 4. The Ninth Circuit has expressly noted that, where there is a dispute about the making of an arbitration agreement, the summary judgment standard of Federal Rule of Civil Procedure 56 is applicable such that "'a court is not authorized to dispose of a motion to compel arbitration until after [material] factual disputes have been resolved."[5] *Knapke*, 38 F.4th at 831. On the other hand, if the requisites for summary judgement under Rule 56 are met, the court can resolve the issue without trial.

        1.      Signatory to Agreement

        In his papers, Mr. Young makes a passing argument that CFO Rick should be compelled to arbitration because it was a signatory to the LLC Agreement which contains an arbitration clause. In other words, Mr. Young suggests that, when Mr. Belgarde signed the LLC Agreement, he did so not only as a member of Millwright but also as the CEO of CFO Rick. *See* Mot. at 17 (arguing that Mr. Belgarde "executed the Agreement when he was admitted as a member and accepted the CFO position on behalf of himself and CFO Rick"); Mot. at 19 (arguing that Mr. Belgarde's "signature on the Agreement was ultimately to allow CFO Rick to accept and [take on] the rights and responsibilities of the Company's CFO position").

        The Court rejects Mr. Young's contention. The signature page for the LLC Agreement clearly and expressly reflects that Mr. Belgarde signed the agreement *as a member of the LLC*.

---

[5] In *In re Carrier IQ, Inc. Consumer Privacy Litigation*, No. C-12-md-2330 EMC, 2014 U.S. Dist. LEXIS 42624 (N.D. Cal. Mar. 28, 2014), this Court noted that, while a summary judgment-type standard applies in determining contract formation, that does not necessarily extend to other issues such as whether a party should be equitably estopped from avoiding an arbitration clause. *See id.* at *29 ("To the extent either party contends that this Court should apply a summary-judgment-type standard in evaluating the pending motion, the Court questions whether that standard is entirely appropriate, especially because courts have generally employed that standard in deciding whether or not there was an agreement to arbitrate in the first place. That would be relevant to, *e.g.*, formation but not equitable estoppel.").

8

CFO Rick's name is not mentioned. Indeed, nowhere in the agreement is CFO Rick's name mentioned at all.

Furthermore, while the LLC Agreement does contemplate that Mr. Belgarde either is or will be the CFO of Millwright, that does not detract from the fact that he signed the agreement in his individual capacity; CFO Rick is not implicated. And even if CFO Rick was doing CFO-related work for Millwright at the time Mr. Belgarde signed the LLC Agreement, that does not signify that Mr. Belgarde signed the agreement on CFO Rick's behalf. Nothing in the agreement or in the record reflects Mr. Belgarde signed the LLC Agreement in such capacity for CFO Rick.

### 2. Nonsignatory to Agreement

Because CFO Rick was not a signatory to the LLC Agreement, the critical question is whether it can be compelled to arbitration as a nonsignatory. Mr. Young makes several arguments as to why CFO Rick – as a nonsignatory – should be compelled. For example:

(1) Mr. Belgarde is undisputedly a signatory to the LLC Agreement, he was the CFO for Millwright, and CFO Rick acted as his **agent** in providing CFO-related services for Millwright. See Mot. at 20 (arguing that CFO Rick "was acting as the agent of Belgarde through its performance of the CFO role created by the [LLC] Agreement"). Since Mr. Belgarde can be compelled to arbitration, his agent CFO Rick should likewise be compelled.

(2) Mr. Belgarde can be compelled to arbitration as a signatory, and CFO Rick is his **alter ego**.

(3) CFO Rick should be **equitably estopped** from avoiding arbitration. It directly **benefited** from the LLC Agreement and therefore cannot avoid the obligations of the agreement, which includes the arbitration clause.

(4) In addition, CFO Rick should be **equitably estopped** because Mr. Belgarde is a signatory to the LLC Agreement and Mr. Belgarde and CFO Rick worked together in injuring Millwright (*i.e.*, there was **interdependent misconduct**).

Both California law and Delaware law recognize agency, equitable estoppel, and alter ego theories as possible bases to compel a nonsignatory to an arbitration agreement to arbitration. *See,*

*e.g.*, *Pillar Proj. AG v. Payward Ventures, Inc.*, 64 Cal. App. 5th 671, 675 (2021) (stating that "there are six theories by which a nonsignatory may be bound to arbitrate: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third party beneficiary") (internal quotation marks omitted); *Kuroda v. SPJS Holdings, L.L.C.*, No. 4030-CC, 2010 Del. Ch. LEXIS 232, at *12 (Del. Ch. Ct. Nov. 30, 2010) (noting that there are "several theories under which a non-signatory to a contract may nonetheless be bound by an arbitration provision contained in the agreement, including: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter ego; (5) third-party beneficiary; and (6) equitable estoppel").  The problem for Mr. Young is that he has failed to show any of these theories is actually applicable in the case at bar and thus fails to carry his burden of proof.  *Cf. Jones v. Jacobson*, 195 Cal. App. 4th 1, 15 (2011) (stating that, where a nonsignatory seeks to enforce an arbitration agreement against a signatory, "the nonsignatory bears the burden to establish he or she is a party to the arbitration agreement/provision covering the dispute") (emphasis omitted); *see also Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) (noting that the defendants who sought to compel arbitration had the burden of showing that the arbitration agreement applied to the nonsignatory plaintiffs).

In this regard, the Court bears in mind that the situation before it is a signatory seeking to compel a *nonsignatory* to arbitration and not vice-versa (*i.e.*, a nonsignatory seeking to compel a *signatory* to arbitration).  There is a difference between the two scenarios.  *Cf. Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (stating that courts "have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" but the situation before the court was the inverse – a signatory seeking to compel a *nonsignatory* to arbitration; this was a material distinction because "the nature of arbitration makes it important" – *i.e.*, "[a]rbitration is strictly a matter of contract") (emphasis in original).

### a.     Agency

As an initial matter, the Court takes into account that Mr. Young has technically put forth two agency theories.  One theory is that Mr. Belgarde was the agent of CFO Rick; the other theory

United States District Court
Northern District of California

is that CFO Rick was the agent of Mr. Belgarde.

The first theory – under which the signatory (Mr. Belgarde) is the agent and the nonsignatory (CFO Rick) is the principal – has been addressed above.  It lacks merit because there is no indication that Mr. Belgarde signed the LLC Agreement as anything but a member of Millwright.  *See Pillar Proj.*, 64 Cal. App. 5th at 676 ("Every California case finding nonsignatories to be bound to arbitrate [on an agency theory] is based on facts that demonstrate . . . the signatory's implicit authority to act on behalf of the nonsignatory.") (internal quotation marks omitted); *Cohen v. TNP 2008 Participating Notes Prg., LLC*, 31 Cal. App. 5th 840 (2019) (same).  Nothing suggests he signed as an agent for CFO Rick.

The second theory – where the signatory (Mr. Belgarde) is the principal and the nonsignatory (CFO Rick) is the agent bound thereby – fares no better.  According to Mr. Young, CFO Rick was Mr. Belgarde's agent because Mr. Belgarde gave to CFO Rick all of his CFO-related work.  But even accepting that as true (CFO Rick disputes such), that does not mean that Mr. Belgarde had the kind of authority vis-à-vis CFO Rick where his obligation to arbitrate should likewise bind CFO Rick (which was essentially an independent contractor even though Mr. Belgarde was its CEO).  *See Crowley Maritime Corp. v. Boston Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1070 (2008) (noting that a nonsignatory can be compelled to arbitrate when it has a preexisting relationship with one of the parties to the arbitration agreement, which "generally gives the party to the agreement [the] *authority to bind the nonsignatory*[;] [e]xamples of the preexisting relationship include agency, spousal relationship, parent-child relationship and the relationship of a general partner to a limited partnership").  Here, there is no such special relationship wherein the authority to bind another (*e.g.*, as a general partner can bind a partnership and thus all the limited partners) is delineated by law or the parties.  *See Bel-Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999) (where plaintiff sought to compel arbitration of both company and its individual officers/directors, plaintiff failed to explain "what principle of agency law enabled [the signatory company] to contract away the [nonsignatory] Individual Appellants' right to litigate their personal liability on claims brought against them").

/ / /

11

United States District Court
Northern District of California

Mr. Young has cited other cases indicating that, where the signatory is the principal, it is not just the principal who is covered by the arbitration agreement but also its nonsignatory agents. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1121 (3d Cir. 1993) (stating that, "[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements"). But those cases are distinguishable from the instant case because they involve agency relationships such as employer-employee or corporation-officer – *i.e.*, where the principal is an entity that can only act through an individual – and the nonsignatory agent, along with the signatory principal, is seeking to compel arbitration. *See id.*; *see also Letizia v. Prudential Bache Secur., Inc.*, 802 F.2d 1185 (9th Cir. 1986) (same). That is not the case here. The Court rejects Mr. Young's agency theories as inapposite.

b.      Alter Ego

Mr. Young argues next that CFO Rick should be compelled to arbitrate, even if a nonsignatory, because it is Mr. Belgarde's alter ego. He contends:

> Belgarde held the CFO title under the [LLC] Agreement, but he did not perform the CFO work personally; [CFO Rick], the corporation he controlled, did. Conversely, CFO Rick performed [Millwright's] CFO functions, but it did so only because Belgarde was named CFO under the Agreement. Each existed and performed in relation to [the LLC Agreement] only through the other. There was no instance in which the roles diverged or the duties were separately exercised. In substance, CFO Rick and Belgarde acted as a single economic unit in carrying out the CFO responsibilities assigned by [the] Agreement.

Mot. at 22.

Mr. Young's alter ego argument cannot be sustained on this record. Even if one assumes that the LLC Agreement appointed Mr. Belgarde as CFO and that Mr. Belgarde had CFO Rick do all CFO-related work, alter-ego law is not about "unity of performance," as claimed by Mr. Young. Mot. at 22-23. Admittedly, there are some Delaware cases that use the phrase "single economic entity." But that phrase should not be considered in isolation. When taken in context, it is clear that Delaware law is not concerned about some kind of unity of performance but rather whether corporate formalities are observed. *See, e.g., Cleveland-Cliffs Burns Harbor Llc v.*

12

*Boomerang Tube, LLC*, No. 2022-0378-LWW 2023 Del. Ch. LEXIS 359, *10-11 (Del. Ch. Ct. Sept. 5, 2023) (taking note of the alter ego doctrine "where the subsidiary and the parent 'operate[] as a single economic entity such that it would be inequitable for th[e] Court to uphold a legal distinction between them'"); *Microsoft Corp. v. Amphus, Inc.*, No. 8092-VCP, 2013 Del. Ch. LEXIS 263, at *19 (Del. Ch. Ct. Oct. 31, 2013) (stating that "Delaware courts will respect corporate formalities, absent a basis to 'pierce the corporate veil,'" with "[o]ne such basis [being] 'where a subsidiary is in fact a mere instrumentality or alter ego of its owner'[;] [a] subsidiary may be the alter ego or mere instrumentality of its parent when the two 'operate[] as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them'"). Thus, ultimately, Delaware law and California law on alter ego are not materially different. *See, e.g.*, *Manichaean Capital, LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706-07 (Del. Ch. Ct. 2021) (noting that "Delaware courts consider a number of factors in determining whether to disregard the corporate form and pierce the corporate veil, including: '(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder'"; in addition, there must be "'an overall element of injustice or unfairness.'"); *VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 244-45 (2002) (stating that the "two principal questions to establish alter ego are whether there is 'such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist' and whether there would be 'an inequitable result if the acts in question are treated as those of the corporation alone'"; factors to consider include "inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers").

/ / /

Because Mr. Young's understanding of alter ego doctrine is flawed, his contention that CFO Rick is the alter ego of Mr. Belgarde is likewise flawed.  Furthermore, in his declaration, Mr. Belgarde addresses how corporate formalities have been observed with respect to CFO Rick and/or how Mr. Young has not addressed the purported failure to observe corporate formalities. *See, e.g.*, Belgarde Decl. ¶ 6 ("CFO Rick has filed federal and California state tax returns in its own name each calendar year since 2009."); Belgarde Decl. ¶ 25(s)-(x) (asserting there is no evidence of, *inter alia*, "any commingling of CFO Rick's and Rick Belgarde's funds or assets or records," "common use of offices or employees," and inadequate capitalization); *see also* Belgarde Decl. ¶¶ 9-10 (testifying that CFO Rick has 16 employees and that, in 2025, it had provided services to approximately 400 customers).  Mr. Young has failed to carry his burden of proof.

At the hearing, Mr. Young mentioned for the first time that forensic accounting that was conducted suggested a failure to observe corporate formalities.  Mr. Young did not provide any such evidence in conjunction with his motion to compel arbitration.  The Court therefore does not consider it.

### c.      Equitable Estoppel – Direct Benefit

Finally, Mr. Young puts forth two equitable estoppel theories as to why CFO Rick, though a nonsignatory, should still be compelled to arbitrate.  The first theory is a direct benefit theory. Under this theory "[a] nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause." *Pillar Proj.*, 64 Cal. App. 5th at 677-78 (internal quotation marks omitted); *see also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001) (noting that nonsignatories have been held "to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement."); *Carrier IQ*, 2014 U.S. Dist. LEXIS 42624, at *32 (same).  The problem with this theory is that Mr. Young has not pointed to a direct benefit that CFO Rick obtained from the LLC Agreement.  As CFO Rick points out, it was never mentioned anywhere in the agreement.  And even if the LLC Agreement appointed Mr. Belgarde as CFO (CFO Rick disputes such), that agreement itself did not directly benefit CFO Rick.  It is the contract between Mr. Belgarde and

United States District Court
Northern District of California

United States District Court
Northern District of California

CFO Rick (or between Millwright and CFO Rick), a legally distinct contract, that benefitted CFO Rick.

### d.       Equitable Estoppel – Interdependent Misconduct

Mr. Young argues that, even if the Court rejects his first equitable estoppel theory, he has a second: *i.e.*, that Mr. Belgarde is clearly a party to the LLC Agreement and thus agreed to arbitrate, and he and CFO Rick acted together to injure Millwright.  Mr. Young contends that this interdependent conduct between a signatory and a nonsignatory (Mr. Belgarde and CFO Rick, respectively) means that the nonsignatory (CFO Rick) can be compelled to arbitrate.

Mr. Young's second equitable estoppel theory is problematic because cases relying on interdependent misconduct involve a *nonsignatory seeking to compel a signatory* to arbitration – and *not* vice-versa.  *See, e.g.*, *E.I. DuPont*, 269 F.3d at 199 (stating that "courts have bound a signatory to arbitrate with a non-signatory at the *nonsignatory's* insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contractual obligations.") (internal quotation marks omitted; emphasis added); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1153 (Del. Ch. Ct. 2006) (stating that "*non-signatories* are permitted to compel signatories to arbitrate disputes under a theory of equitable estoppel" – *e.g.*, "'when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract'") (emphasis added); *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 218-19 (2009) (stating that "a *nonsignatory* may compel arbitration only when the claims against the nonsignatory are founded in and inextricably bound up with the obligations imposed by the agreement containing the arbitration clause[;] [i]n other words, allegations of substantially interdependent and concerted misconduct by signatories and nonsignatories, standing alone, are not enough: the allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the underlying agreement") (emphasis added).  Binding a signatory who has already agreed to be bound by an agreement is one thing;  it is quite another to

bind a nonsignatory who has not agreed to be bound.  That it may be more efficient to have both Mr. Belgarde and CFO Rick in the same forum is not a basis to compel CFO Rick, as a nonsignatory, to arbitration.  *See Nitsch v. DreamWorks Animation SKG, Inc.*, 100 F. Supp. 3d 851, 869 (N.D. Cal. 2015) (Koh, J.) (stating than an agreement to arbitrate cannot be expanded just to achieve greater efficiency).

Furthermore, Mr. Young's second estoppel theory is flawed because, as indicated in *E.I. DuPont* and *Goldman*, the allegations of interdependent misconduct must have a direct relationship to the agreement containing the arbitration provision.  *See also id.* at 867-68 (emphasizing such); *Carrier IQ*, 2014 U.S. Dist. LEXIS 42624, at \*54-56 (involved when a nonsignatory can compel a signatory) (stating that "the interdependent misconduct between the parties alone is not enough," but rather that "conduct must be founded in or intimately connected with the obligations of the underlying agreement"; "[m]ere allegations of collusive behavior between signatories and nonsignatories to a contract are not enough to compel arbitration between parties who have not agreed to arbitrate") (internal quotation marks omitted).  Here, the agreement at issue is the LLC Agreement which is about the operation of the LLC generally; that is entirely distinct and independent from the arrangement with CFO Rick which purportedly facilitated the alleged wrongdoing.

3.      Summary

There is no genuine dispute of material fact that CFO Rick is not a signatory to the LLC Agreement.  In addition, based on the record submitted, there is no legal basis to compel CFO Rick, as a nonsignatory, to arbitration – whether based on an agency, alter-ego, or equitable estoppel theory.  The Court therefore denies Mr. Young's motion to compel arbitration.

To the extent CFO Rick asks that the Court issue a preliminary injunction (*i.e.*, to enjoin arbitration against CFO Rick pending resolution of this case), the Court shall not entertain the request because it was procedurally improper.  The request was made in CFO's opposition to the motion to compel arbitration.  However, the Court's ruling here does not bar CFO Rick from moving for preliminary or even permanent relief in light of the Court's denial of the motion to compel arbitration.  Moreover, nothing bars CFO Rick from providing the arbitrator with a copy

United States District Court
Northern District of California

of this order.   The Court has no reason to expect this ruling will not be respected by the arbitrator.

B.	Motion to Dismiss

Given that the Court is denying the motion to compel arbitration, the motion to dismiss is likewise denied.  The motion to dismiss has been brought primarily pursuant to Federal Rule of Civil Procedure 12(b)(6).  The motion also refers to Rule 12(b)(1) and (3) (lack of subject matter jurisdiction and improper venue, respectively) but those rules are not on point; they have been invoked simply as part of Mr. Young's contention that the proper forum is arbitration and not the Court.

The Court acknowledges that Mr. Young makes one 12(b)(6) argument that is different from those raised in his motion to compel arbitration.  Specifically, he asserts that the Court has the discretion to deny declaratory relief.  *See generally Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1107 (9th Cir. 2011) (stating that a "district court has discretion to determine whether maintaining jurisdiction over [a] declaratory action would be appropriate"; factors to consider include "whether retaining jurisdiction would: (1) involve the needless determination of state law issues; (2) encourage the filing of declaratory actions as a means of forum shopping; (3) risk duplicative litigation; (4) resolve all aspects of the controversy in a single proceeding; (5) serve a useful purpose in clarifying the legal relations at issue; (6) permit one party to obtain an unjust res judicata advantage; (7) risk entangling federal and state court systems; or (8) jeopardize the convenience of the parties").  The Court determines that maintaining jurisdiction over this case is proper.  The Court sees no reason why it should not issue declaratory relief.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

17

### III.   CONCLUSION

For the foregoing reasons, the Court denies Mr. Young's motion to compel arbitration and his motion to dismiss.  Given the rulings herein, the Court also orders the parties to meet and confer to determine whether they can reach a stipulation on the resolution of this case (Mr. Young can reserve his right to appeal, if he so chooses).  A stipulation would save the parties' resources rather than forcing the parties to spend time and money litigating, *e.g.*, a motion by CFO Rick seeking affirmative relief or a judgment on the merits.  The parties shall report back on the results of their meet and confer within two weeks of the date of this order.  The Court's order herein does not address the merits of Mr. Belgarde's declaratory judgment suit against Mr. Young (No. C-25-10863).

This order disposes of Docket Nos. 12 and 22.

**IT IS SO ORDERED**.

Dated: February 17, 2026

_____
EDWARD M. CHEN
United States District Judge